# 16-454

## United States Court of Appeals for the Second Circuit

STUART SANSEVIRO,

*Plaintiff-Appellant,*

v.

STATE OF NEW YORK, EDWARD FRANKE, New York State Police Investigator, JOHN DOES, 1-5 New York State Police Officers, NEW YORK STATE POLICE DEPARTMENT, STATE OF NEW YORK, POLICE CAPTAIN, STATE OF NEW YORK, POLICE SENIOR INVESTIGATOR, JOHN DOES, 1-5 Nassau County Assistant District Attorneys, JOHN DOE, The customer who purchased the Rock River Arms LAR-15 rifle, Serial Number CM208678, NASSAU COUNTY, JOHN DOES, 1-8 New York State Police Investigator, MADELINE SINGAS, Acting District Attorney for Nassau County, ELISE MCCARTHY, Nassau County Assistant District Attorney, KAREN BENNETT, Nassau County Assistant District Attorney, TERESA CORRIGAN, former Nassau County Assistant District Attorney, CHARLES RIBANDO, Nassau County District Attorney Chief Investigator,

*Defendants-Appellees.*

On Appeal from the United States District Court for the Eastern District of New York

## BRIEF FOR STATE APPELLEES

BARBARA D. UNDERWOOD
*Solicitor General*
ANISHA S. DASGUPTA
*Deputy Solicitor General*
ERIC DEL POZO
*Assistant Solicitor General
of Counsel*

ERIC T. SCHNEIDERMAN
*Attorney General of the
State of New York*
Attorney for State Appellees
120 Broadway
New York, New York 10271
(212) 416-6167

Dated: August 30, 2016

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................iii

PRELIMINARY STATEMENT ................................................................ 1

ISSUES PRESENTED ............................................................................... 3

STATEMENT OF THE CASE ................................................................. 3

    A.   Statutory Background............................................................ 3

        1.   The federal government's restrictions on weapons with military-style features (1994–2004) ........................ 3

        2.   New York's own restrictions on military-style assault weapons (2000–present) ...................................... 5

    B.   The Joint State and County Investigation into the Sale of Prohibited Weapons in Nassau County ............................. 8

        1.   Police uncover illegal weapons purchased from T&T Gunnery, spurring an investigation ................................. 8

        2.   Sanseviro sells a weapon with prohibited features to an undercover investigator ........................................ 10

        3.   The resulting arrest and criminal charges .................... 12

    C.   Sanseviro's Lawsuit under 42 U.S.C. § 1983 ........................ 14

        1.   The complaint's claims .................................................. 14

        2.   The district court's award of summary judgment to defendants .................................................................... 14

STANDARD OF REVIEW & SUMMARY OF ARGUMENT ................. 16

# TABLE OF CONTENTS (cont'd)

Page

ARGUMENT ....................................................................... 18

POINT I  -  SUMMARY JUDGMENT WAS PROPERLY
GRANTED TO THE STATE DEFENDANTS ON
SANSEVIRO'S § 1983 FALSE ARREST CLAIM ........... 18

A. Because the State Police Had Probable Cause to
Arrest Sanseviro for Selling the LAR-15, the
Arrest Did Not Violate His Constitutional Rights. ..... 19

1. Officers had probable cause to conclude that
the LAR-15 was a restricted weapon....................... 19

2. The existence of probable cause does not turn
on the beliefs and motives of the State Police
or Nassau County District Attorney's Office. ......... 25

B. In Any Event, the State Police Defendants Are
Entitled to Qualified Immunity Because the
Governing Law Was Not Clearly Established. ........... 27

POINT II  -  SUMMARY JUDGMENT WAS PROPERLY
GRANTED TO INVESTIGATOR FRANKE ON
SANSEVIRO'S § 1983 MALICIOUS
PROSECUTION CLAIM ................................................... 31

A. Investigator Franke Had Probable Cause for the
Charges and at a Minimum Is Entitled to
Qualified Immunity. ...................................................... 32

B. The Evidence Also Fails to Show Malice. ................... 36

POINT III -  THE REMAINING CLAIMS AGAINST THE STATE
DEFENDANTS ARE ABANDONED AND
MERITLESS ..................................................................... 38

CONCLUSION ....................................................................... 40

ii

# TABLE OF AUTHORITIES

**Cases**                                                                                    **Page**

*Ashcroft v. al-Kidd,*
563 U.S. 731 (2011) ....................................................................... 28, 29

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009) ............................................................................. 39

*Askins v. Doe No. 1,*
727 F.3d 248 (2d Cir. 2013) ............................................................... 38

*Coollick v. Hughes,*
699 F.3d 211 (2d Cir. 2012) ............................................................... 16

*Devenpeck v. Alford,*
543 U.S. 146 (2004) ............................................................................. 26

*Fabrikant v. French,*
691 F.3d 193 (2d Cir. 2012) ............................................................... 19

*Figueroa v. Mazza,*
825 F.3d 89 (2d Cir. 2016) ................................................................. 27

*Florida v. Harris,*
133 S. Ct. 1050 (2013) ................................................................... 20, 24

*Jaegly v. Couch,*
439 F.3d 149 (2d Cir. 2006) ............................................................... 25

*Jocks v. Tavernier,*
316 F.3d 128 (2d Cir. 2013) ............................................................... 32

*Lore v. City of Syracuse,*
670 F.3d 127 (2d Cir. 2012) ......................................................... 16, 38

*Lotes Co. v. Hon Hai Precision Indus. Co.,*
753 F.3d 395 (2d Cir. 2014) ............................................................... 19

*Lowth v. Town of Cheektowaga,*
82 F.3d 563 (2d Cir. 1996) .......................................................... 33, 36

iii

## TABLE OF AUTHORITIES (cont'd)

**Cases**                                                          **Page**

*Markman v. City of New York*,
629 F. App'x 119 (2d Cir. 2015) ........................................................ 24

*Martin v. City of Albany*,
42 N.Y.2d 13 (1977) ............................................................................ 36

*Messerschmidt v. Millender*,
132 S. Ct. 1235 (2012) .................................................................. 28, 31

*Morse v. Fusto*,
804 F.3d 538 (2d Cir. 2015) .............................................................. 33

*Mullenix v. Luna*,
136 S. Ct. 305 (2015) ......................................................................... 31

*N.Y. State Rifle & Pistol Ass'n v. Cuomo*,
804 F.3d 242 (2d Cir. 2015) ............................................................ 4, 7

*Oefinger v. N.Y. State Police*,
146 A.D.2d 186 (3d Dep't 1989) ........................................................ 23

*People v. Neal*,
79 A.D.3d 523 (1st Dep't 2010) ......................................................... 30

*People v. Wood*,
58 A.D.3d 242 (1st Dep't 2008) ......................................................... 30

*Poe v. Leonard*,
282 F.3d 123 (2d Cir. 2002) .............................................................. 39

*Ricciuti v. N.Y.C. Transit Auth.*,
124 F.3d 123 (2d Cir. 1997) .............................................................. 33

*Scott v. Harris*,
550 U.S. 372 (2007) ........................................................................... 35

*Singer v. Fulton Cnty. Sheriff*,
63 F.3d 110 (2d Cir. 1995) ........................................................... 32, 36

iv

# TABLE OF AUTHORITIES (cont'd)

**Cases** **Page**

*Stansbury v. Wertman,*
   721 F.3d 84 (2d Cir. 2013) ...................................................... 19, 24, 32

*Staples v. United States,*
   511 U.S. 600 (1994) ........................................................................ 22

*United States v. Gagnon,*
   373 F.3d 230 (2d Cir. 2004) .............................................................. 26

*Walczyk v. Rio,*
   496 F.3d 139 (2d Cir. 2007) .............................................................. 16

*Whren v. United States,*
   517 U.S. 806 (1996) .................................................................... 25, 26

*Winfield v. Trottier,*
   710 F.3d 49 (2d Cir. 2013) ................................................................ 28

*Zahrey v. Coffey,*
   221 F.3d 342 (2d Cir. 2000) .............................................................. 33

*Zalaski v. City of Hartford,*
   723 F.3d 382 (2d Cir. 2013) ...................................................... passim

## Statutes

*Federal*

Violent Crime Control and Law Enforcement Act of 1994,
   Pub. L. No. 103-322, 108 Stat. 1796 ...................................................... 5

28 U.S.C. § 1367 ................................................................................ 39

*New York*

Ch. 1, 2013 N.Y. Laws, *amended by* Ch. 57, 2013 N.Y. Laws .................. 7

Ch. 189, 2000 N.Y. Laws 2788 ............................................................. 5, 6

**TABLE OF AUTHORITIES (cont'd)**

**Statutes** **Page**

*New York (cont'd)*

Penal Law
  § 265.00 ................................................................. 1, 6, 23
  § 265.00(22) ................................................................ passim
  § 265.00(22) (2011) ..................................................... 6, 30
  § 265.02 ........................................................................ 24
  § 265.10 ..................................................................... passim
  § 265.20 ..................................................................... passim

**Rules**

Fed. R. Civ. P. 56 .......................................................... 16

**Miscellaneous Authorities**

ATF Report and Recommendation on the Importability of
  Certain Semiautomatic Rifles (July 6, 1989), *at*
  www.atf.gov/file/61761/download ..................................... 3, 4

H.R. Rep. No. 103-489 (1994) ......................................... 4

N.Y. State Senate Introducer's Mem. in Support, Bill No.
  S2230, *reprinted in* Bill Jacket for ch. 1 (2013) ..................... 7

## PRELIMINARY STATEMENT

New York State restricts the possession and sale of "assault weapons," *see* Penal Law § 265.00 *et seq.*, which state law defines to include a semiautomatic rifle (i) capable of accepting a detachable magazine, and (ii) that also contains at least two of several statutorily listed features associated with military-style combat, *see id.* § 265.00(22)(a).

Plaintiff-appellant Stuart Sanseviro became one of the first persons arrested and charged with violating those restrictions after he sold—to an undercover state police investigator—a semiautomatic weapon with multiple statutorily listed characteristics, two of which were obscured by tweaks that the State Police reversed in minutes using common tools. After a grand jury declined to indict the owner of the business where Sanseviro worked, the Nassau County District Attorney's Office withdrew the charges against Sanseviro in the interests of justice. Sanseviro now asserts claims for false arrest and malicious prosecution under 42 U.S.C. § 1983 against New York State, the State Police, Nassau County, and various state and county officials.

The United States District Court for the Eastern District of New York (Wexler, J.) granted summary judgment against Sanseviro on all claims. This Court should affirm with respect to the state defendants.[1]

As the undisputed proof shows, probable cause supported the arrest and charging of Sanseviro for illegally selling a military-style assault weapon that had superficially been made to appear legal. And at a minimum, the state defendants are entitled to qualified immunity because a reasonably competent officer could have believed that the sale violated New York's statutory restrictions, which no court had yet construed at the time of Sanseviro's arrest and prosecution.

---

[1] This brief is filed on behalf of the New York State defendants. The county defendants are separately represented.

## ISSUES PRESENTED

1.     Are state police officers entitled to summary judgment on Sanseviro's § 1983 claim of false arrest arising from the sale of an arguably illegal semiautomatic rifle?

2.     Is a state police investigator entitled to summary judgment on Sanseviro's § 1983 claim of malicious prosecution based on the criminal charges resulting from that sale?

3.     Has Sanseviro likewise failed to raise any triable issue on his other federal and state claims against the state defendants?

## STATEMENT OF THE CASE

### A.   Statutory Background

#### 1.   The federal government's restrictions on weapons with military-style features (1994–2004)

Starting in the late 1980s, the federal Bureau of Alcohol, Tobacco, and Firearms (ATF) began receiving requests to authorize the importation of semiautomatic weapons with certain features designed primarily for military combat. *See* ATF Report and Recommendation on the Importability of Certain Semiautomatic Rifles 6 (July 6, 1989), *at* www.atf.gov/file/61761/download.  Those features included (i) the ability

3

to accept a detachable magazine, allowing for "a fairly large ammunition supply and the ability to rapidly reload"; (ii) a pistol grip "that protrudes conspicuously" from the body of the weapon, to "aid in one-handed firing of the weapon in a combat situation"; (iii) a flash suppressor, which "disperses the muzzle flash when the firearm is fired to help conceal the shooter's position"; and (iv) a folding or telescoping stock, allowing both "portability" and the ability to fire the weapon "from the folded position." *Id.* at 6–7.

Congress held five years of hearings on these firearms, which ATF termed "semiautomatic assault weapons." *See N.Y. State Rifle & Pistol Ass'n v. Cuomo*, 804 F.3d 242, 248 (2d Cir. 2015) (*NYSRPA*). During the hearings, law enforcement officials testified to "the rising level of lethality they face[d] from assault weapons on the street." H.R. Rep. No. 103-489, at 15 (1994). And expert evidence showed that "the features that characterize a semiautomatic weapon as an assault weapon are not merely cosmetic, but do serve specific, combat-functional ends." *Id.* at 18.

In response to this and other evidence, Congress passed legislation restricting the manufacture, transfer, and possession of

"semiautomatic assault weapons." Violent Crime Control and Law Enforcement Act of 1994, Pub. L. No. 103-322, tit. XI, subtit. A, § 110102(b), 108 Stat. 1796, 1996–97. Congress defined that category to include eighteen specific firearms and their "copies or duplicates," as well as semiautomatic firearms that accepted a detachable magazine and had at least two of several statutorily listed features associated with military-style combat. *See id.* § 110102(b), 108 Stat. at 1997–98. The federal restrictions lapsed in 2004 and were not renewed. *See id.* § 110105(2), 108 Stat. at 2000 (sunset provision).

### 2. New York's own restrictions on military-style assault weapons (2000–present)

In 2000, New York's Legislature independently restricted the possession and sale of semiautomatic assault weapons, enabling the investigation and prosecution of these offenses by state and local law enforcement. New York's statutory prohibition was modeled on the then-existing federal restrictions.[2] *See* Ch. 189, § 10, 2000 N.Y. Laws

---

[2] The New York law contained some language that the federal law does not. Specifically, New York law prohibits not only certain designated weapons and their copies or duplicates, but also the

(*continued on the next page*)

2788, 2792. The state legislation made it a felony for a civilian to possess an assault weapon unless that weapon was lawfully possessed when the federal restrictions were enacted. *See id.*; *see also* Penal Law §§ 265.02(7), 265.20(a)(1). The state law also made it a felony to "dispose[ ]" of any assault weapon to a civilian, Penal Law § 265.10(3), a term defined to cover sales and offers for sale, *id.* § 265.00(6).

During the time period relevant to this lawsuit, New York law defined an "assault weapon" in two distinct ways. The first definition focused on the particular characteristics possessed by a semiautomatic weapon ("characteristic" assault weapons). *See id.* § 265.00(22)(a)–(c) (as effective Feb. 2011) (reproduced in Addendum). As relevant here, the category included any semiautomatic rifle that could "accept a detachable magazine and ha[d] at least two of the following characteristics: (i) a folding or telescoping stock; (ii) a pistol grip that protrudes conspicuously beneath the action of the weapon; (iii) a bayonet mount; (iv) a flash suppressor or threaded barrel designed to

---

"functioning frames or receivers of such weapons." Penal Law § 265.00(22)(d). That additional language is not at issue in this appeal.

accommodate a flash suppressor; [or] (v) a grenade launcher."[3] *Id.* § 265.00(22)(a). The second definition provided for several makes of rifle, along with their "copies or duplicates," to be treated as assault weapons without further inquiry into the weapons' specific characteristics ("per se" assault weapons). *Id.* § 265.00(22)(d). The "per se" assault weapons identified by the statute included the Colt AR-15—the model for the Rock River LAR-15 that plaintiff Sanseviro was arrested for selling.

Unlike its federal counterpart, the New York law had no sunset provision and thus remained fully in effect at the time of plaintiff's 2011 arrest; it remains in effect today as substantially modified by the 2013 SAFE Act. *See* Ch. 1, 2013 N.Y. Laws, *amended by* Ch. 57, pt. FF, 2013 N.Y. Laws at 128–29 (L.R.S.).

---

[3] The SAFE Act sought to make New York's assault-weapons laws "clearer" and "easier to enforce" by restricting the possession of semiautomatic rifles that are capable of accepting a detachable magazine and that also contain any *single* other military-style feature. N.Y. State Senate Introducer's Mem. in Support, Bill No. S2230, *reprinted in* Bill Jacket for ch. 1 (2013), at 10. This Court recently affirmed the constitutionality of those restrictions. *See NYSRPA*, 804 F.3d at 247.

7

### B. The Joint State and County Investigation into the Sale of Prohibited Weapons in Nassau County

#### 1. Police uncover illegal weapons purchased from T&T Gunnery, spurring an investigation

The arrest and charges underlying this lawsuit followed a joint investigation by the State Police Troop L Gun Investigation Unit and the Nassau County District Attorney's Office into the sale of potentially illegal semiautomatic rifles. (*See* Joint Appendix (J.A.) 184–196.)

In late 2009, police officers responding to unrelated calls came across several privately-owned illegal assault weapons that had been purchased from T&T Gunnery, a firearms merchant in Seaford, New York. (J.A. 177–180, 266.) The discovery prompted an investigation in which the District Attorney's Office supplied funding for undercover state police officers to buy semiautomatic rifles from several Nassau County dealers. (J.A. 240–258, 263–264.) Many of the acquired weapons had a protruding pistol grip; a threaded barrel designed for a flash suppressor, but on which a different attachment (known as a muzzle

8

brake[4]) was affixed; and a collapsible stock, in which a pin was inserted to inhibit the stock from folding inward. (J.A. 266–69.)

T&T Gunnery sold several such weapons to investigators in 2010. (J.A. 184–191, 209–212.) As State Police Investigator Edward Franke explained at his deposition, these weapons "were always on the rack" at T&T Gunnery and "there to buy." (J.A. 318.)

According to T&T Gunnery's owner, Martin Tretola, State Police Technical Sergeant Wyndell Hurtt gave firearms dealers permission to "remove the illegal characteristics from rifles sold elsewhere in the United States to make them 'NY Compliant' for sale to the public." (J.A. 142.) As Tretola states, Sergeant "Hurtt recommended that a muzzle brake should be pinned and welded 360 [degrees] or that the adjustable stocks must be both epoxied and pinned." (J.A. 142.) Hurtt recalled giving Tretola this exact advice. (J.A. 402–403.) According to Hurtt, welding muzzles and epoxying stocks were one way to implement the broader recommendation that, to render an assault weapon legal for sale in New York, any "adjustments" to banned features "would have to

---

[4] A muzzle brake is a device that connects to the muzzle of a firearm to reduce recoil and the rising of the barrel when fired.

be *permanent* and not easily reversible by reasonable means." (J.A. 402 (emphasis added); *see also* J.A. 310, 312.)

Plaintiff Stuart Sanseviro testified at his deposition that he understood "easily" reversible in this context to mean "something anybody could do." (Dist. Ct. dkt. #130-3, at 74:23.) Similarly, Investigator Franke testified to understanding that a change reversible by "any layperson with normal tools" could not make an assault weapon legally compliant. (J.A. 312.) As Franke explained, an attempt to unfasten a welded-on muzzle "would result in permanent damage to the barrel." (J.A. 213.) And as Sergeant Hurtt testified, forcing an epoxied stock to collapse would "decimate the stock." (J.A. 403.) According to Hurtt, only such permanent changes could effectively nullify the proscribed features and potentially "make the weapon New York compliant." (J.A. 403.)

### 2. Sanseviro sells a weapon with prohibited features to an undercover investigator

In August 2010, Sanseviro, working at T&T Gunnery, sold a Rock River "LAR-15" semiautomatic rifle with prohibited characteristics to

10

an undercover state police investigator.[5] (J.A. 133, 224, 380; *see also* J.A. 151–153 (sale paperwork), 224 (picture of LAR-15 in question), 544.25 (sale receipt).) The LAR-15 is styled after the Colt AR-15 (*see* J.A. 318)—a firearm that New York law identifies as a "per se" assault weapon, Penal Law § 265.00(22)(d)(iv). Sanseviro discussed the LAR-15 with the undercover officer, answered questions, helped with the necessary paperwork, and closed the sale. (J.A. 289, 389.) At no point did Sanseviro request proof of the purchaser's authorization to possess an assault weapon, nor did the undercover investigator provide any such proof. (*See* J.A. 154, 382–387.)

That evening, at State Police Troop L headquarters, Investigator Franke and a colleague undid two changes that had been made to the LAR-15 before the sale. (J.A. 319.) As Franke stated at his deposition, he removed the LAR-15's muzzle brake with a handheld wrench, exposing "a perfectly threaded barrel" capable of accepting a flash suppressor. (J.A. 319.) Franke "just put the box wrench on it, held the firearm with [his] other hand, and twisted the muzzle device off." (J.A.

---

[5] The record contains video footage of the sale, recorded via hidden camera. (*See* Dist. Ct. dkt. 130-1, at 2 (Ex. 6).)

319.) In addition to exposing the threaded barrel, Franke was "able to take the pin out of the collapsible stock and render it operable." (J.A. 319.) An internal police report documents these results. (J.A. 217.)

The record on appeal contains a video of the process. (*See* J.A. 544.1.) The video shows Franke unscrewing the muzzle brake just as he describes; it also shows Franke hitting the weapon's end against the ground twice and then using pliers to remove a dislodged pin, restoring the stock to collapsibility. As the video reveals (at 2:00 to 6:50), investigators were able to complete both tasks in less than five minutes. Sergeant Hurtt thereafter test-fired the LAR-15, which "operated properly." (Dist. Ct. dkt. #131-1, at 99 (examination report); *see also* J.A. 211.)

### 3. The resulting arrest and criminal charges

In February 2011, police sought a warrant to search five Nassau County gun shops for further evidence of possible trafficking in illegal assault weapons. (J.A. 173–200.) In a detailed supporting affidavit, Investigator Franke described the investigation and dozens of prior firearm purchases, including that of the LAR-15. (J.A. 190.) The court

authorized a search of T&T Gunnery for assault weapons that had been "'pinned'" for sale to the public. (J.A. 156.)

A day later, during the search warrant's execution, Franke and other members of the State Police arrested Sanseviro at T&T Gunnery for having sold the LAR-15. (J.A. 133, 261, 288–290.) Franke signed a two-count felony complaint, charging Sanseviro with disposing of an assault weapon in violation of Penal Law § 265.10(3) (Count One); and with delivering that firearm without first requiring proof of a valid license or exempt status to possess the weapon, in violation of Penal Law § 400.00(12) (Count Two). (J.A. 160–161.)

Sanseviro was held overnight, arraigned in the morning, and then released without bail. (J.A. 134; Dist. Ct. dkt. #130-4 (Sanseviro Dep.), at 134:6–137:14.) After a grand jury elected not to indict T&T Gunnery or its principals, prosecutors moved to dismiss the charges against Sanseviro in the interests of justice. (J.A. 143; *see also* Dist. Ct. dkt. #131-1 (Bennett Dep.), at 61:5–11.) The charges were formally dismissed in May 2012. (J.A. 164, 219.)

## C.   Sanseviro's Lawsuit under 42 U.S.C. § 1983

### 1.   The complaint's claims

After the charges against him were dismissed, Sanseviro filed this lawsuit under 42 U.S.C. § 1983 against New York State, the State Police, Nassau County, and assorted state and county officers. (J.A. 1–7.) The operative complaint contains fifteen claims. (J.A. 52–73.) Against the state defendants, Sanseviro alleges false arrest, malicious prosecution (by Investigator Franke), failure to adequately supervise subordinates, and violation of procedural due process. (J.A. 52, 54, 60, 68.) He also brings analogous claims under state law. (J.A. 66, 68.)

### 2.   The district court's award of summary judgment to defendants

The district court (Wexler, J.) granted summary judgment to defendants on all claims. (Special Appendix (S.A.) 1–17.)

The court held that the state police defendants were entitled to qualified immunity from individual liability on Sanseviro's false arrest claim because the undisputed proof establishes "'arguable probable cause' for the arrest." (S.A. 9.) According to the court, a reasonable officer could have believed that Sanseviro unlawfully sought to sell to a

14

civilian an assault weapon with multiple banned characteristics, as defined in Penal Law § 265.00(22)(a). (S.A. 9.) That was so "particularly in light of the substantial uncertainty" over the scope of the relevant New York statutes "as applied to the sale of the [LAR-15] by a licensed dealer to non-law enforcement civilians." (S.A. 10.)

For similar reasons, the court held that Investigator Franke was entitled to qualified immunity from liability on Sanseviro's claim of malicious prosecution. (S.A. 11–14.) The court also held that, in any event, the evidence was insufficient to show malice: *i.e.*, that "Investigator Franke initiated criminal proceedings against Sanseviro for something other than a desire to see the ends of justice served." (S.A. 11 (quotation marks omitted).) Nor, in the court's view, was a trial under § 1983 warranted by the assertion that Franke had fabricated evidence by undoing changes to the LAR-15. (S.A. 9, 13, 16.)

The district court further held that the Eleventh Amendment barred Sanseviro's claims against the State, the State Police, and state police officers in their official capacities. (S.A. 7.) The court dismissed the § 1983 claim of inadequate supervision given the lack of a compensable underlying violation. (S.A. 16.) And having concluded that

15

Sanseviro had not created a triable issue on any of his federal claims, the court declined to exercise jurisdiction over Sanseviro's state law claims. (S.A. 16–17.)

## STANDARD OF REVIEW & SUMMARY OF ARGUMENT

This Court reviews de novo a grant of summary judgment, including a judgment based on qualified immunity. *See Coollick v. Hughes*, 699 F.3d 211, 219 (2d Cir. 2012). Summary judgment is appropriate where the movant demonstrates that "no genuine issue of material fact exists and that the undisputed facts entitle him to judgment as a matter of law." *Id.* (quotation marks omitted); *see* Fed. R. Civ. P. 56(a). In § 1983 litigation, where the material facts are undisputed, "the existence of probable cause is a question of law for the court." *Walczyk v. Rio*, 496 F.3d 139, 157 (2d Cir. 2007). So too is a defendant's entitlement to qualified immunity. *See Lore v. City of Syracuse*, 670 F.3d 127, 162 (2d Cir. 2012).

Here, the district court properly awarded summary judgment to the state defendants on Sanseviro's § 1983 claims. Undisputed evidence establishes that, despite his knowledge of New York's assault-weapons

restrictions, Sanseviro sold a semiautomatic rifle with several statutorily prohibited features to an undercover officer purporting to be a civilian. And the summary judgment evidence further shows that—in less than five minutes, using common tools—a different state police investigator was able to reverse a pair of superficial tweaks that had been made to the weapon prior to sale, thus revealing two of those prohibited features. The state police defendants accordingly had probable cause to arrest Sanseviro and to charge him with violating New York's criminal restrictions on disposing of assault weapons.

Moreover, even if the State Police were somehow mistaken in their belief that Sanseviro's sale of the LAR-15 was illegal, the unsettled legal landscape in which the police were operating entitles the state officers to qualified immunity. Nor does the record contain any support for Sanseviro's claim that the state police investigator who undid the LAR-15's modifications acted with the intention of fabricating evidence. Because Sanseviro has abandoned all of the other claims in his complaint—and those claims in any event fail for substantially the same reasons as do Sanseviro's false arrest and malicious prosecution

17

claims—the entry of summary judgment for the state defendants should be affirmed.

## ARGUMENT

### POINT I

### SUMMARY JUDGMENT WAS PROPERLY GRANTED TO THE STATE DEFENDANTS ON SANSEVIRO'S § 1983 FALSE ARREST CLAIM

Sanseviro's § 1983 false arrest claim fails as a matter of law because, as the undisputed evidence demonstrates, Sanseviro sold a semiautomatic rifle possessing several restricted military-style features to an undercover investigator who did not show proof of eligibility to own that rifle—thus giving the State Police probable cause to arrest Sanseviro. But even if the State Police were ultimately incorrect in believing that the weapon's characteristics qualified it as restricted, entry of summary judgment for the state defendants was still appropriate because the belief at issue was reasonable under existing law—giving rise to arguable probable cause and supporting a grant of qualified immunity, as the district court correctly observed.

**A.    Because the State Police Had Probable Cause to Arrest Sanseviro for Selling the LAR-15, the Arrest Did Not Violate His Constitutional Rights.**

**1.    Officers had probable cause to conclude that the LAR-15 was a restricted weapon.**

Probable cause "presents a total defense" to a § 1983 claim for unlawful arrest in violation of the Fourth Amendment.[6] *Stansbury v. Wertman*, 721 F.3d 84, 89 (2d Cir. 2013). As generally understood, "[p]robable cause for an arrest requires an officer to have knowledge or reasonably trustworthy information sufficient to warrant a person of reasonable caution in the belief that an offense has been committed." *Fabrikant v. French*, 691 F.3d 193, 214 (2d Cir. 2012) (quotation marks omitted). Probable cause does *not* require that an officer's belief in culpability be "'correct or more likely true than false.'" *Zalaski v. City of Hartford*, 723 F.3d 382, 390 (2d Cir. 2013) (quoting *Texas v. Brown*, 460 U.S. 730, 742 (1983)). Nor do any other "rigid rules" or "mechanistic

---

[6] Having concluded that the State Police were entitled to qualified immunity, the district court found it unnecessary to resolve whether Sanseviro's arrest was supported by probable cause. This Court may affirm, however, on any ground supported by the record. *See Lotes Co. v. Hon Hai Precision Indus. Co.*, 753 F.3d 395, 413 (2d Cir. 2014).

inquiries" govern the "practical and common-sensical" analysis. *Florida v. Harris*, 133 S. Ct. 1050, 1055–56 (2013).

Analysis of probable cause to arrest under state law requires consideration of the pertinent state statutes. *See, e.g.*, *Zalaski*, 723 F.3d at 390 (delving into details of "Connecticut's prohibition of disorderly conduct"). Here, the pertinent statute is New York's prohibition on transferring an assault weapon—defined to include any semiautomatic rifle that can accept a detachable magazine and has more than one statutorily listed military-style feature—to persons falling outside of enumerated exceptions. *See* Penal Law § 265.00(22)(a) (as effective Feb. 2011) (reproduced in Addendum); *see also id.* §§ 265.10(3), 265.20.

The summary judgment evidence shows that officers of reasonable caution could have concluded that the LAR-15 purchased from Sanseviro had at least two restricted characteristics. The LAR-15 indisputably had "a pistol grip that protrude[d] conspicuously beneath the action of the weapon." *Id.* § 265.00(22)(a)(ii). (*See* J.A. 211, 224.) It also possessed a "threaded barrel designed to accommodate a flash suppressor." Penal Law § 265.00(22)(a)(iv). When sold, the LAR-15's barrel had a different attachment—a muzzle brake—affixed to its end.

20

But as State Police Investigator Franke testified at his deposition, and as a video recording confirms, unscrewing that attachment—which took less than thirty seconds' effort with a household wrench—exposed "a perfectly threaded barrel." (J.A. 319; *see* J.A. 544.1 (at 2:00 to 2:30).)

According to Investigator Franke, the LAR-15's threaded barrel "could have accepted" a flash suppressor. (J.A. 320.) The record contains no evidence to the contrary. Sanseviro's sale of the LAR-15 was thus comparable to selling an illegal assault weapon with a pistol grip and threaded barrel, plus a detachable muzzle brake thrown in for free.

T&T Gunnery and Sanseviro could have followed advice they had previously received from the State Police and "welded" the muzzle brake "360 [degrees]" around. (J.A. 142.) Such a change might have made the barrel incapable of accepting a flash suppressor—or anything else—by inviting "permanent damage to the barrel" if the welded attachment were removed. (J.A. 312.) Instead, unscrewing the muzzle brake from the LAR-15 revealed threads in "perfect condition" (J.A. 313), with not a single one "altered or destroyed" (J.A. 319).

In addition, by hitting the LAR-15 against the ground and using common pliers, Investigator Franke was "able to take the pin out of the

21

collapsible stock and render it operable" in less than four minutes. (J.A. 319; *see* J.A. 544.1 (at 2:30 to 6:50).) And because those offending features were readily exposed "without damaging that weapon," a reasonable officer had probable cause to conclude that at least two banned "characteristics still exist[ed]" on the LAR-15 when sold. (J.A. 344 (testimony of State Police Captain James Dewar).)

There is no merit to Sanseviro's contention (Br. at 37–42) that probable cause to arrest was negated by *Staples v. United States*, which construed the federal machine-gun ban to require knowledge of the characteristics that make the gun illegal, 511 U.S. 600, 602 (1994). Even if New York's assault-weapons restrictions had such a *mens rea* requirement—a question that New York courts have not yet addressed (see *infra* at 29–30)—a reasonable officer could have believed that element satisfied in this case. *See Zalaski*, 723 F.3d at 393 (recognizing wide latitude that arresting officers have in determining suspects' possible culpable intent). By his own account, Sanseviro spent almost "every day" of 2010 assisting at T&T Gunnery. (J.A. 132–133.) According to police, T&T Gunnery "always" had semiautomatic rifles with threaded barrels and pinned stocks "there to buy" (J.A. 318) and

sold several such weapons to investigators that year (J.A. 184–191, 209–212). Moreover, Sanseviro "actively sold" the LAR-15, in a transaction caught on video. (J.A. 289–290; *see* J.A. 389.) From these facts, officers could have inferred Sanseviro's knowledge of the LAR-15's banned features and the ease with which they could be revealed by actions that, in Sanseviro's words, "anybody could do." (Dist. Ct. dkt. #130-3, at 74:23.)

Nor was probable cause defeated by New York Penal Law § 265.20(a)(10), which exempts a licensed "dealer in firearms" such as T&T Gunnery from liability for disposing of certain types of weapons. *See* Br. at 16, 28. That same section excepts "an assault weapon" from the exemption. Penal Law § 265.20(a)(16). To be sure, the Penal Law elsewhere defines a "dealer in firearms" to include a business that sells assault weapons, *id.* § 265.00(9), but that definition contemplates sales only to persons "who may lawfully possess" such weapons, *Oefinger v. N.Y. State Police*, 146 A.D.2d 186, 189 (3d Dep't 1989).[7]

---

[7] Individuals who may lawfully possess otherwise banned assault weapons in New York include, for example, police and peace officers,

(*continued on the next page*)

Because New York generally bars civilians from possessing assault weapons, *see* Penal Law § 265.02(7), a reasonable officer could conclude that "gun stores weren't allowed to sell these guns to regular people" (J.A. 309 (testimony of Investigator Franke)). That is how a competitor of T&T Gunnery understood the law. (J.A. 507.) And that is obviously how T&T Gunnery and Sanseviro understood the law because they regularly modified assault weapons for sale to the general public. *See, e.g.*, *Markman v. City of New York*, 629 F. App'x 119, 121 (2d Cir. 2015) (holding that different Penal Law § 265.20 exemption did not defeat probable cause for arrest, where reasonable officer could have believed that exemption did not apply).

The Fourth Amendment does not require police to be "legal technicians." *Harris*, 133 S. Ct. at 1055 (quotation marks omitted). And probable cause depends on "the entire tale" told by the evidence, rather than on any "single chapter." *Stansbury*, 721 F.3d at 90. In these circumstances, Sanseviro cannot make out a claim of false arrest.

---

military servicemembers, and certain defense contractors. *See* Penal Law § 265.20(a)(1)(a)–(e).

24

2.  **The existence of probable cause does not turn on the beliefs and motives of the State Police or Nassau County District Attorney's Office.**

Much of Sanseviro's appeal brief focuses on what he asserts was the investigation's "real purpose" (Br. at 9): to galvanize enforcement of New York's restrictions on "per se" assault weapons, *see* Penal Law § 265.00(22)(d), on the theory that such weapons could never be made compliant for sale to New York civilians. But these assertions of purpose are irrelevant to whether the State Police had probable cause—or, for that matter, arguable probable cause (see *infra* Point I.B)—to arrest Sanseviro. The supposed "actual motivations" of individual officers "play no role in ordinary, probable-cause Fourth Amendment analysis." *Whren v. United States*, 517 U.S. 806, 813 (1996).

Sanseviro is not aided by his observation (Br. at 6, 43) that Investigator Franke's search-warrant affidavit described the rifles acquired in the investigation as *both* "characteristic" assault weapons under Penal Law § 265.00(22)(a) and "per se" assault weapons under § 265.00(22)(d) (*see* J.A. 174–176). "[A] claim for false arrest turns only on whether probable cause existed to arrest a defendant," regardless of "any charge actually invoked by the arresting officer." *Jaegly v. Couch*,

25

439 F.3d 149, 154 (2d Cir. 2006); *accord Zalaski*, 723 F.3d at 390 n.4. Because an officer could simply have "made the arrest without stating the grounds," *Devenpeck v. Alford*, 543 U.S. 146, 156 (2004), Franke's mention of "per se" assault weapons in the search-warrant affidavit has no bearing on whether probable cause also existed to arrest Sanseviro for selling a "characteristic" assault weapon.

Equally irrelevant to probable cause are the beliefs and motives that Sanseviro attributes to the Nassau County defendants. Sanseviro asserts that then-D.A. Kathleen Rice admitted her desire to spur enforcement of New York's restrictions on selling "per se" assault weapons—a motivation that Sanseviro characterizes as "political" (Br. at 9). But there is nothing improper or political about a prosecutor's intent to enforce a valid statute according to its terms. In any event, a prosecutor's "subjective view" of possible charges does not determine whether police have objective probable cause for an arrest. *United States v. Gagnon*, 373 F.3d 230, 239 (2d Cir. 2004); *see also Whren*, 517 U.S. at 813. Thus, the validity of Sanseviro's arrest in no way depends on how other governmental actors—such as county prosecutors or even the New York State Attorney General's Office (*see* Br. at 23–25)—might

26

have viewed charges for selling modified "per se" weapons when the rifles in question also qualified as "characteristic" weapons. In any case, the summary judgment record contains no evidence suggesting that *any* law enforcement official ever took the position that certain temporarily altered rifles could not be both "per se" *and* "characteristic" assault weapons.

## B. In Any Event, the State Police Defendants Are Entitled to Qualified Immunity Because the Governing Law Was Not Clearly Established.

Sanseviro's false arrest claim fails as a matter of law for another reason. Regardless of whether actual probable cause to arrest was present here, qualified immunity would shield the individual state defendants from § 1983 liability so long as "*any* reasonable officer, out of the wide range of reasonable people who enforce the laws in this country, *could* have" thought a crime was committed. *Figueroa v. Mazza*, 825 F.3d 89, 100 (2d Cir. 2016). Put another way, no § 1983 liability attaches "so long as 'arguable probable cause' was present when the arrest was made." *Id.*

As the district court correctly concluded, that standard was satisfied here. The undisputed evidence "establishes the existence of 'arguable

27

probable cause'" to arrest Sanseviro for selling an assault weapon with multiple banned characteristics to an apparent civilian. (S.A. 9.)

For qualified-immunity purposes, an official's action must be assessed against "the legal rules that were clearly established at the time it was taken." *Messerschmidt v. Millender*, 132 S. Ct. 1235, 1245 (2012) (quotation marks omitted). To allow for § 1983 liability, "existing" statutes and case law must place "beyond debate" a conclusion that the official acted unlawfully in the situation confronted. *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011); *accord, e.g.*, *Winfield v. Trottier*, 710 F.3d 49, 56–57 (2d Cir. 2013).

Here, as the district court observed, Sanseviro cannot show that the state police defendants violated any clearly established law. (S.A. 10.) As of Sanseviro's arrest, courts had yet to address (i) whether New York's restrictions on "characteristic" assault weapons, *see* Penal Law § 265.00(22)(a), extended to weapons in which the offending features had been temporarily or superficially obscured; (ii) whether and to what extent New York's prohibition on disposing of a "characteristic" assault weapon, *see id.* § 265.10(3), contained a *mens rea* requirement; and (iii) whether the exemption from criminal liability

28

for licensed firearms dealers, *see id.* § 265.20(a)(10), extended to the sale of an assault weapon by such a dealer to a private person. Even if the state officers here were wrong on some or all of these issues, raised by Sanseviro as objections to the existence of actual probable cause (*see* Br. at 18, 28, 37), the existing law was at best uncertain on these points (S.A. 10). And "reasonable but mistaken judgments about open legal questions" justify qualified immunity. *al-Kidd*, 563 U.S. at 743.

In addition, such law as there was at the time of Sanseviro's arrest is consistent with the State Police's understanding that the LAR-15 sale was illegal. For example, law enforcement officers could reasonably conclude, in the absence of relevant precedent, that a firearm with banned features does not lose its status as a "characteristic" assault weapon if the features are superficially disguised or concealed prior to sale. *See id.* at 741 (holding qualified immunity supported by vacuum of authority foreclosing statute's application in specific circumstance).

Similarly, although no New York appellate court has yet addressed whether Penal Law § 265.10(3) contains a *mens rea* requirement, law enforcement officers could reasonably rely on the fact that New York's

courts have generally declined to extend a knowledge requirement to the specific characteristics that make a weapon illegal, so long as the item is "readily identifiable" as a weapon. *People v. Wood*, 58 A.D.3d 242, 249 (1st Dep't 2008); *accord, e.g.*, *People v. Neal*, 79 A.D.3d 523, 524 (1st Dep't 2010). There is no question here that Sanseviro knew the LAR-15 was a weapon.

Finally, the background law also supports the conclusion that Sanseviro's sale of the LAR-15 to a person appearing to be a civilian fell outside Penal Law § 265.20(a)(10)'s exemption from criminal liability for licensed firearms dealers. Penal Law § 265.20(a)(16) expressly excludes assault weapons from the exemption at issue. And the law was very clear in providing that civilians could not possess assault weapons except under a statutory grandfathering provision. *See* Penal Law § 265.00(22)(e)(v) (as effective Feb. 2011). As the district court observed, if the exemption in § 265.20(a)(10) in fact shielded Sanseviro's conduct, that was at best unclear. (S.A. 14.)

Indeed, Sanseviro himself references email correspondence demonstrating that, up until his arrest, the State Police were seeking guidance from county prosecutors about the precise charges that could

be brought. *See* Br. at 16–17 (citing J.A. 171–172 & 541–544, emails between Nassau County A.D.A. Karen Bennett and State Police Investigator Franke). These consultations "provide[ ] further support for the conclusion that an officer could reasonably have believed" that probable cause supported the resulting arrest. *Messerschmidt*, 132 S. Ct. at 1249.

In sum, an officer cannot be made to answer in damages for acting against such a "hazy legal backdrop." *Mullenix v. Luna*, 136 S. Ct. 305, 309 (2015) (per curiam); *see also Zalaski*, 723 F.3d at 393 (affording officer qualified immunity given unsettled scope of state law at time of arrests). Summary judgment for the state police defendants was therefore appropriate.

## POINT II

### SUMMARY JUDGMENT WAS PROPERLY GRANTED TO INVESTIGATOR FRANKE ON SANSEVIRO'S § 1983 MALICIOUS PROSECUTION CLAIM

Sanseviro similarly fails to raise any triable issue on his § 1983 malicious prosecution claim against State Police Investigator Franke, who signed the felony complaint containing the formal charges. (J.A. 54–55, 160–161.) A claim for malicious prosecution requires a showing that a criminal charge terminated in the plaintiff's favor, that the

31

charge lacked supporting probable cause, and that it was motivated by malice. *See, e.g.*, *Jocks v. Tavernier*, 316 F.3d 128, 136 (2d Cir. 2013).[8] Here, Sanseviro cannot show an absence of actual or arguable probable cause, nor can he show the presence of malice. Thus, his claim for malicious prosecution fails as a matter of law.

## A. Investigator Franke Had Probable Cause for the Charges and at a Minimum Is Entitled to Qualified Immunity.

Sanseviro's malicious prosecution claim against Investigator Franke fails at the outset because probable cause supported each of the charges brought. *See Zalaski*, 723 F.3d at 388. A showing of probable cause makes it "impossible for plaintiff to prevail on a malicious prosecution claim." *Stansbury*, 721 F.3d at 95.

In this case, the same facts providing probable cause to arrest Sanseviro for selling an assault weapon to an apparent civilian (see *supra* Point I.A.1) also provided probable cause for the ensuing charges,

---

[8] The claim also requires a "post-arraignment deprivation of liberty that rises to the level of a constitutional violation." *Singer v. Fulton Cnty. Sheriff*, 63 F.3d 110, 116–17 (2d Cir. 1995). That element is not contested here.

thereby defeating any claim of malicious prosecution (J.A. 160–161). As the district court noted (S.A. 14), no new information learned between Sanseviro's arrest and his arraignment the next morning altered the legal analysis. *See Lowth v. Town of Cheektowaga*, 82 F.3d 563, 571 (2d Cir. 1996) (holding that probable cause to prosecute depends on facts acquired up until a suspect is "actually charged").

At any rate, as the district court properly held (S.A. 14), the existence of "substantial uncertainty" over the scope of the relevant New York statutes entitles Investigator Franke to qualified immunity from § 1983 liability. See *supra* Point I.B. In an effort to avoid this conclusion, Sanseviro contends that Investigator Franke "fabricated evidence" (Br. at 29)—misconduct that, if it had occurred, might have violated a clearly established "right not to be deprived of liberty as a result of the fabrication of evidence by a government officer," *Zahrey v. Coffey*, 221 F.3d 342, 349 (2d Cir. 2000); *see also Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 130 (2d Cir. 1997).

Sanseviro's assertion is baseless, however. Relying on the proposition that the Constitution bars the "knowing manipulation of data" during a criminal investigation, *Morse v. Fusto*, 804 F.3d 538,

33

540–41 (2d Cir. 2015),[9] Sanseviro claims that Investigator Franke engaged in just such a manipulation when he reversed the alterations to the LAR-15 (*see* Br. at 42–43).

But Sanseviro has made no showing that police or prosecutors intended to offer evidence about the LAR-15 *without* disclosing the after-sale actions performed on the weapon. And, indeed, that manner of proceeding would have been inconsistent with the theory of liability underpinning the prosecution: *i.e.*, that any pre-sale modifications to the LAR-15 were too superficial to render the weapon legal.

Thus, the video in the summary judgment record accurately depicts the entire process by which Franke exposed the LAR-15's offending features. (*See* J.A. 544.1.) Likewise, Franke's search-warrant affidavit transparently describes the pinning of stocks and affixing of muzzle brakes by gun dealers such as T&T Gunnery, along with how officers were able to undo those changes. (J.A. 176, 184–191.) Although Sanseviro faults Investigator Franke for not disclosing that other parts of the LAR-15 also were detachable (Br. at 46–47), that issue has no

---

[9] The State has sought certiorari in *Morse* and that petition is currently pending (No. 15-1510, filed June 15, 2016).

34

bearing on whether the LAR-15 was sold with a threaded barrel designed for a flash suppressor or a collapsible stock, in violation of New York law.

Similarly, the video evidence wholly rebuts Sanseviro's allegation (Br. at 46) that Franke could not reverse the modifications without "breaking" the rifle. The video plainly shows Investigator Franke unscrewing the LAR-15's muzzle attachment and restoring the collapsible stock in a matter of minutes, using everyday tools. And unrebutted evidence confirms that the LAR-15 thereafter "operated properly." (Dist. Ct. dkt. #131-1, at 99; *see* J.A. 211.) The video likewise belies Sanseviro's claim that state police officers were "acting contrary to their own advice to licensed gun dealers" (Br. at 51)—advice mandating that any adjustments to banned features be "*permanent* and not easily reversible" (J.A. 402 (emphasis added)). In sum, Sanseviro's assertions are "utterly discredited" by the video evidence, which means they cannot defeat summary judgment. *Scott v. Harris*, 550 U.S. 372, 380 (2007).

## B. The Evidence Also Fails to Show Malice.

The district court also correctly held that Sanseviro's malicious prosecution claim fails for a further reason: the evidence reveals no malice. (S.A. 11.) The elements of a § 1983 claim for malicious prosecution derive in part from New York's common law. *See, e.g.*, *Singer*, 63 F.3d at 118. One such element is that of "malice," which, under New York law, requires proof "'that the defendant must have commenced the criminal proceeding due to a wrong or improper motive.'" *Lowth*, 82 F.3d at 573 (quoting *Nardelli v. Stamberg*, 44 N.Y.2d 500, 502–03 (1978)).

The New York Court of Appeals has declared malice and lack of probable cause to be "independent and indispensable elements of a malicious prosecution action." *Martin v. City of Albany*, 42 N.Y.2d 13, 17 (1977). Whereas the absence of probable cause may show an improper motive, it is "not dispositive" of that question. *Lowth*, 82 F.3d at 573; *see also Martin*, 42 N.Y.2d at 18.

Here, the existence of probable cause (and arguable probable cause) to institute each of the two charges resolves Sanseviro's § 1983 claim of malicious prosecution. See *supra* Points I & II.A. In addition,

36

the background to Sanseviro's arrest and prosecution negates any inference of malice. The charges against Sanseviro followed a wide-ranging investigation into the practices of many different Nassau County gun dealers, resulting in a slew of criminal charges against multiple persons. (J.A. 184–196.) Although Sanseviro cites a prior judgment secured by T&T Gunnery against certain Nassau County defendants in a different case as purported grounds for retaliation and malice (*see* Br. at 18–19; J.A. 220–221), nothing links that lawsuit to Investigator Franke, who testified to having no specific knowledge about it (J.A. 293).[10] Insufficient proof of malice is thus another basis for affirming summary judgment for Investigator Franke on Sanseviro's malicious prosecution claim.

---

[10] The prior lawsuit arose from criminal charges brought by the Nassau County District Attorney's Office against the owner of T&T Gunnery for an allegedly faulty gas line on the business's premises. (J.A. 40, 138.)

## POINT III

## THE REMAINING CLAIMS AGAINST THE STATE DEFENDANTS ARE ABANDONED AND MERITLESS

Sanseviro's brief on appeal addresses only his claims of false arrest and malicious prosecution under § 1983, abandoning all of the complaint's other claims. This Court should therefore decline to reach those claims. *See Lore*, 670 F.3d at 149. In any event, the claims also fail for other reasons.

As the district court observed (S.A. 7), Sanseviro's summary judgment papers did not even attempt to defend his claims against New York State, the State Police, or officers in their official capacities, thereby forfeiting those claims in the proceedings below. *See Askins v. Doe No. 1*, 727 F.3d 248, 252 (2d Cir. 2013). And as the district court also correctly observed (S.A. 15–16), Sanseviro's claim of a procedural due process violation fails based on his inability to make any showing that Investigator Franke fabricated evidence. See *supra* at 33–35.

Similarly, Sanseviro's § 1983 claim for supervisory liability cannot proceed in light of his failure to demonstrate (i) any compensable underlying violation, or (ii) any inadequate supervision by a specific

member of the State Police. *See Poe v. Leonard*, 282 F.3d 123, 126 (2d Cir. 2002); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009).

Finally, Sanseviro's state law claims for false arrest, malicious prosecution, and supervisory liability against the state defendants fail for the same reasons as do his cognate federal claims. Moreover, the district court appropriately refused to exercise jurisdiction over the state law claims with no viable federal claim. *See* 28 U.S.C. § 1367(c)(3).

## CONCLUSION

The award of summary judgment to the state defendants should be affirmed.

Dated:  New York, NY
        August 30, 2016

                                        Respectfully submitted,

                                        ERIC T. SCHNEIDERMAN
                                          *Attorney General of the*
                                          *State of New York*
                                        Attorney for State Appellees


                                        By:   /s/ Eric Del Pozo
                                              ERIC DEL POZO
                                              Assistant Solicitor General

                                              120 Broadway, 25th Floor
                                              New York, NY 10271
BARBARA D. UNDERWOOD                          (212) 416-6167
  *Solicitor General*
ANISHA S. DASGUPTA
  *Deputy Solicitor General*
ERIC DEL POZO
  *Assistant Solicitor General*
    *of Counsel*

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(a)(7)(C) of the Federal Rules of Appellate Procedure, Oren L. Zeve, an employee in the Office of the Attorney General of the State of New York, hereby certifies that according to the word count feature of the word processing program used to prepare this brief, the brief contains 7,155 words and complies with the type-volume limitations of Rule 32(a)(7)(B).

     <u>  /s/ Oren L. Zeve        </u>

      Oren L. Zeve

# Addendum

McKinney's Consolidated Laws of New York Annotated
   Penal Law (Refs & Annos)
     Chapter 40. Of the Consolidated Laws (Refs & Annos)
      Part Three. Specific Offenses
       Title P. Offenses Against Public Safety
        Article 265. Firearms and Other Dangerous Weapons (Refs & Annos)

This section has been updated. Click here for the updated version.

McKinney's Penal Law § 265.00

§ 265.00 Definitions

Effective: July 30, 2010 to January 14, 2013

As used in this article and in article four hundred, the following terms shall mean and include:

1. "Machine-gun" means a weapon of any description, irrespective of size, by whatever name known, loaded or unloaded, from which a number of shots or bullets may be rapidly or automatically discharged from a magazine with one continuous pull of the trigger and includes a sub-machine gun.

2. "Firearm silencer" means any instrument, attachment, weapon or appliance for causing the firing of any gun, revolver, pistol or other firearms to be silent, or intended to lessen or muffle the noise of the firing of any gun, revolver, pistol or other firearms.

3. "Firearm" means (a) any pistol or revolver; or (b) a shotgun having one or more barrels less than eighteen inches in length; or (c) a rifle having one or more barrels less than sixteen inches in length; or (d) any weapon made from a shotgun or rifle whether by alteration, modification, or otherwise if such weapon as altered, modified, or otherwise has an overall length of less than twenty-six inches; or (e) an assault weapon. For the purpose of this subdivision the length of the barrel on a shotgun or rifle shall be determined by measuring the distance between the muzzle and the face of the bolt, breech, or breechlock when closed and when the shotgun or rifle is cocked; the overall length of a weapon made from a shotgun or rifle is the distance between the extreme ends of the weapon measured along a line parallel to the center line of the bore. Firearm does not include an antique firearm.

4. "Switchblade knife" means any knife which has a blade which opens automatically by hand pressure applied to a button, spring or other device in the handle of the knife.

5. "Gravity knife" means any knife which has a blade which is released from the handle or sheath thereof by the force of gravity or the application of centrifugal force which, when released, is locked in place by means of a button, spring, lever or other device.

5-a. "Pilum ballistic knife" means any knife which has a blade which can be projected from the handle by hand pressure applied to a button, lever, spring or other device in the handle of the knife.

5-b. "Metal knuckle knife" means a weapon that, when closed, cannot function as a set of plastic knuckles or metal knuckles, nor as a knife and when open, can function as both a set of plastic knuckles or metal knuckles as well as a knife.

5-c. "Automatic knife" includes a stiletto, a switchblade knife, a gravity knife, a cane sword, a pilum ballistic knife, and a metal knuckle knife.

6. "Dispose of" means to dispose of, give, give away, lease-loan, keep for sale, offer, offer for sale, sell, transfer and otherwise dispose of.

7. "Deface" means to remove, deface, cover, alter or destroy the manufacturer's serial number or any other distinguishing number or identification mark.

8. "Gunsmith" means any person, firm, partnership, corporation or company who engages in the business of repairing, altering, assembling, manufacturing, cleaning, polishing, engraving or trueing, or who performs any mechanical operation on, any firearm, large capacity ammunition feeding device or machine-gun.

9. "Dealer in firearms" means any person, firm, partnership, corporation or company who engages in the business of purchasing, selling, keeping for sale, loaning, leasing, or in any manner disposing of, any assault weapon, large capacity ammunition feeding device, pistol or revolver.

**ADD2**

10. "Licensing officer" means in the city of New York the police commissioner of that city; in the county of Nassau the commissioner of police of that county; in the county of Suffolk the sheriff of that county except in the towns of Babylon, Brookhaven, Huntington, Islip and Smithtown, the commissioner of police of that county; for the purposes of section 400.01 of this chapter the superintendent of state police; and elsewhere in the state a judge or justice of a court of record having his office in the county of issuance.

11. "Rifle" means a weapon designed or redesigned, made or remade, and intended to be fired from the shoulder and designed or redesigned and made or remade to use the energy of the explosive in a fixed metallic cartridge to fire only a single projectile through a rifled bore for each single pull of the trigger.

12. "Shotgun" means a weapon designed or redesigned, made or remade, and intended to be fired from the shoulder and designed or redesigned and made or remade to use the energy of the explosive in a fixed shotgun shell to fire through a smooth bore either a number of ball shot or a single projectile for each single pull of the trigger.

13. "Cane Sword" means a cane or swagger stick having concealed within it a blade that may be used as a sword or stiletto.

14. [See also subd. 14 below] "Chuka stick" means any device designed primarily as a weapon, consisting of two or more lengths of a rigid material joined together by a thong, rope or chain in such a manner as to allow free movement of a portion of the device while held in the hand and capable of being rotated in such a manner as to inflict serious injury upon a person by striking or choking. These devices are also known as nunchakus and centrifugal force sticks.

14. [See also subd. 14 above] "Antique firearm" means:

Any unloaded muzzle loading pistol or revolver with a matchlock, flintlock, percussion cap, or similar type of ignition system, or a pistol or revolver which uses fixed cartridges which are no longer available in the ordinary channels of commercial trade.

15. "Loaded firearm" means any firearm loaded with ammunition or any firearm which is possessed by one who, at the same time, possesses a quantity of ammunition which may be used to discharge such firearm.

15-a. "Electronic dart gun" means any device designed primarily as a weapon, the purpose of which is to momentarily stun, knock out or paralyze a person by passing an electrical shock to such person by means of a dart or projectile.

15-b. "Kung Fu star" means a disc-like object with sharpened points on the circumference thereof and is designed for use primarily as a weapon to be thrown.

15-c. "Electronic stun gun" means any device designed primarily as a weapon, the purpose of which is to stun, cause mental disorientation, knock out or paralyze a person by passing a high voltage electrical shock to such person.

16. "Certified not suitable to possess a self-defense spray device, a rifle or shotgun" means that the director or physician in charge of any hospital or institution for mental illness, public or private, has certified to the superintendent of state police or to any organized police department of a county, city, town or village of this state, that a person who has been judicially adjudicated incompetent, or who has been confined to such institution for mental illness pursuant to judicial authority, is not suitable to possess a self-defense spray device, as defined in section 265.20 of this article, or a rifle or shotgun.

17. "Serious offense" means (a) any of the following offenses defined in the former penal law as in force and effect immediately prior to September first, nineteen hundred sixty-seven: illegally using, carrying or possessing a pistol or other dangerous weapon; making or possessing burglar's instruments; buying or receiving stolen property; unlawful entry of a building; aiding escape from prison; that kind of disorderly conduct defined in subdivisions six and eight of section seven hundred twenty-two of such former penal law; violations of sections four hundred eighty-three, four hundred eighty-three-b, four hundred eighty-four-h and article one hundred six of such former penal law; that kind of criminal sexual act or rape which was designated as a misdemeanor; violation of section seventeen hundred forty-seven-d and seventeen hundred forty-seven-e of such former penal law; any violation of any provision of article thirty-three of the public health law relating to narcotic drugs which was defined as a misdemeanor by section seventeen hundred fifty-one-a of such former penal law, and any violation of any provision of article thirty-three-A of the public health law relating

to depressant and stimulant drugs which was defined as a misdemeanor by section seventeen hundred forty-seven-b of such former penal law.

(b) [As amended by L.1999, c. 635, § 11. See, also, par. (b) below.] any of the following offenses defined in the penal law: illegally using, carrying or possessing a pistol or other dangerous weapon; possession of burglar's tools; criminal possession of stolen property in the third degree; escape in the third degree; jostling; fraudulent accosting; endangering the welfare of a child; the offenses defined in article two hundred thirty-five; issuing abortional articles; permitting prostitution; promoting prostitution in the third degree; stalking in the fourth degree; stalking in the third degree; the offenses defined in article one hundred thirty; the offenses defined in article two hundred twenty.

(b) [As amended by L.1999, c. 635, § 15. See, also, par. (b) above.] any of the following offenses defined in the penal law: illegally using, carrying or possessing a pistol or other dangerous weapon; possession of burglar's tools; criminal possession of stolen property in the third degree; escape in the third degree; jostling; fraudulent accosting; endangering the welfare of a child; the offenses defined in article two hundred thirty-five; issuing abortional articles; permitting prostitution; promoting prostitution in the third degree; stalking in the third degree; stalking in the fourth degree; the offenses defined in article one hundred thirty; the offenses defined in article two hundred twenty.

18. "Armor piercing ammunition" means any ammunition capable of being used in pistols or revolvers containing a projectile or projectile core, or a projectile or projectile core for use in such ammunition, that is constructed entirely (excluding the presence of traces of other substances) from one or a combination of any of the following: tungsten alloys, steel, iron, brass, bronze, beryllium copper, or uranium.

19. "Duly authorized instructor" means (a) a duly commissioned officer of the United States army, navy, marine corps or coast guard, or of the national guard of the state of New York; or (b) a duly qualified adult citizen of the United States who has been granted a certificate as an instructor in small arms practice issued by the United States army, navy or marine corps, or by the adjutant general of this state, or by the national rifle association of America, a not-for-profit corporation duly organized under the laws of this state; or (c) by a person duly qualified and designated by the department of environmental conservation under paragraph d of subdivision six of section 11-0713 of the environmental conservation law as its agent in the giving of instruction and the making of certifications of qualification in responsible hunting practices.

WESTLAW   © 2016 Thomson Reuters. No claim to original U.S. Government Works.

20. "Disguised gun" means any weapon or device capable of being concealed on the person from which a shot can be discharged through the energy of an explosive and is designed and intended to appear to be something other than a gun.

21. "Semiautomatic" means any repeating rifle, shotgun or pistol, regardless of barrel or overall length, which utilizes a portion of the energy of a firing cartridge or shell to extract the fired cartridge case or spent shell and chamber the next round, and which requires a separate pull of the trigger to fire each cartridge or shell.

22. "Assault weapon" means (a) a semiautomatic rifle that has an ability to accept a detachable magazine and has at least two of the following characteristics:

(i) a folding or telescoping stock;

(ii) a pistol grip that protrudes conspicuously beneath the action of the weapon;

(iii) a bayonet mount;

(iv) a flash suppressor or threaded barrel designed to accommodate a flash suppressor;

(v) a grenade launcher; or

(b) a semiautomatic shotgun that has at least two of the following characteristics:

(i) a folding or telescoping stock;

(ii) a pistol grip that protrudes conspicuously beneath the action of the weapon;

(iii) a fixed magazine capacity in excess of five rounds;

**ADD6**

(iv) an ability to accept a detachable magazine; or

(c) a semiautomatic pistol that has an ability to accept a detachable magazine and has at least two of the following characteristics:

(i) an ammunition magazine that attaches to the pistol outside of the pistol grip;

(ii) a threaded barrel capable of accepting a barrel extender, flash suppressor, forward handgrip, or silencer;

(iii) a shroud that is attached to, or partially or completely encircles, the barrel and that permits the shooter to hold the firearm with the nontrigger hand without being burned;

(iv) a manufactured weight of fifty ounces or more when the pistol is unloaded;

(v) a semiautomatic version of an automatic rifle, shotgun or firearm; or

(d) any of the weapons, or functioning frames or receivers of such weapons, or copies or duplicates of such weapons, in any caliber, known as:

(i) Norinco, Mitchell, and Poly Technologies Avtomat Kalashnikovs (all models);

(ii) Action Arms Israeli Military Industries UZI and Galil;

(iii) Beretta Ar70 (SC-70);

(iv) Colt AR-15;

(v) Fabrique National FN/FAL, FN/LAR, and FNC;

(vi) SWD M-10, M-11, M-11/9, and M-12;

(vii) Steyr AUG;

(viii) INTRATEC TEC-9, TEC-DC9 and TEC-22; and

(ix) revolving cylinder shotguns, such as (or similar to) the Street Sweeper and Striker 12;

(e) provided, however, that such term does not include: (i) any rifle, shotgun or pistol that (A) is manually operated by bolt, pump, lever or slide action; (B) has been rendered permanently inoperable; or (C) is an antique firearm as defined in 18 U.S.C. 921(a)(16);

(ii) a semiautomatic rifle that cannot accept a detachable magazine that holds more than five rounds of ammunition;

(iii) a semiautomatic shotgun that cannot hold more than five rounds of ammunition in a fixed or detachable magazine;

(iv) a rifle, shotgun or pistol, or a replica or a duplicate thereof, specified in Appendix A to section 922 of 18 U.S.C. as such weapon was manufactured on October first, nineteen hundred ninety-three. The mere fact that a weapon is not listed in Appendix A shall not be construed to mean that such weapon is an assault weapon; or

(v) a semiautomatic rifle, a semiautomatic shotgun or a semiautomatic pistol or any of the weapons defined in paragraph (d) of this subdivision lawfully possessed prior to September fourteenth, nineteen hundred ninety-four.

23. "Large capacity ammunition feeding device" means a magazine, belt, drum, feed strip, or similar device, manufactured after September thirteenth, nineteen hundred ninety-four, that has a capacity of, or that can be readily restored or converted to accept, more than ten rounds of ammunition; provided, however, that such term does not include an attached tubular device designed to accept, and capable of operating only with, .22 caliber rimfire ammunition.

**Credits**

(L.1965, c. 1030. Amended L.1967, c. 791, § 46; L.1969, c. 123, § 1; L.1972, c. 588, § 1; L.1972, c. 605, § 1; L.1974, c. 179, § 1; L.1974, c. 462, § 1; L.1974, c. 986, §§ 1, 2; L.1974, c. 1041, § 1; L.1976, c. 217, § 1; L.1982, c. 492, § 1; L.1985, c. 61, § 1; L.1986, c. 328, § 2; L.1986, c. 646, § 1; L.1988, c. 264, § 1; L.1990, c. 264, § 1; L.1995, c. 219, § 2; L.1996, c. 354, § 2; L.1997, c. 446, § 2, eff. Aug. 25, 1997; L.1998, c. 378, § 1, eff. Nov. 1, 1998; L.1999, c. 210, § 1, eff. Nov. 1, 1999; L.1999, c. 635, §§ 11, 15, eff. Dec. 1, 1999; L.2000, c. 189, §§ 8 to 10, eff. Nov. 1, 2000; L.2003, c. 264, § 33, eff. Nov. 1, 2003; L.2007, c. 510, § 3, eff. Feb. 11, 2008; L.2008, c. 257, § 3, eff. Nov. 1, 2008; L.2010, c. 232, §§ 2, 3, eff. July 30, 2010.)